Filed 5/16/23 (unmodified opn. attached)

## CERTIFIED FOR PUBLICATION

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSHUA NARANJO,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>DOCTORS MEDICAL CENTER OF MODESTO, INC.,<br><br>    Defendant and Respondent. | F083197<br><br>(Super. Ct. No. CV-21-001363)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGEMENT]** |

**THE COURT:**

It is so ordered that the opinion filed on April 28, 2023, be modified as follows:

1.  At the beginning of page 4, after the quoted sentence "[T]he EMS Fee was designated as 40100038 ER ROOM LEVEL IV, which hides the fact that the EMS Fee is a separate fee not based on any specific item of treatment or service," add as footnote 3 the following, which will require renumbering of all subsequent footnotes.

> **3**    Medical Center argues Naranjo's use of the phrase "Evaluation and Management Services Fee" is, in essence, an acknowledgment the EMS Fee is for "services." It appears, however, Naranjo is using the name Medical Center gave to the fee in its Charge Description Master, discussed *post*.

2.  On page 10, heading I.A. is modified to read as follows:

> *A.  Medical Center's Request for Judicial Notice is Denied, in Part, and Granted, in part.*

3.  On page 11, the last paragraph beginning "Medical Center also requests" and on page 12, the first paragraph beginning "Finally, Medical Center also" are both deleted along with footnote 4 and replaced with the following paragraph which may require renumbering of subsequent footnotes:

> "Medical Center also requests we judicially notice its 2019 list of 25 common outpatient procedures and 2019 Chargemaster, both of which were filed with OSHPD.  We grant Medical Center's request as to both the 2019 list of 25 common outpatient procedures and 2019 Chargemaster.  (Evid. Code, §§ 452, subd. (h), 453, 459 subd. (a).)  However, in light of the opinions expressed herein, we do not view these two lists to be of consequence to our determination of this appeal.

4.  On page 13, in the first paragraph following heading II., the phrase "fact or" is removed from the second quoted sentence and replaced with an ellipsis so that sentence now reads:

> We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of … law.

There is no change in the judgment.  Respondent's petition for rehearing filed on May 11, 2023, is denied.

FRANSON, J.

**WE CONCUR:**

HILL, P. J.

SMITH, J.

2.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JOSHUA NARANJO, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> DOCTORS MEDICAL CENTER OF MODESTO, INC., <br><br> Defendant and Respondent. | F083197 <br><br> (Super. Ct. No. CV-21-001363) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County. John Mayne, Judge.

Carpenter Law, Gretchen Carpenter; Law Office of Barry Kramer and Barry L. Kramer for Plaintiff and Appellant.

Norton Rose Fulbright, Jeffrey B. Margulies, Kevin C. Mayer and Jacqueline C. Karama for Defendant and Respondent.

-ooOoo-

Plaintiff and appellant Joshua Naranjo appeals from a judgment of dismissal entered after the trial court sustained a demurrer to his first amended complaint without leave to amend. Judgment was entered in favor of defendant and respondent Doctors

Medical Center of Modesto, Inc. doing business as Emanual Medical Center (Medical Center).  We reverse the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

Naranjo filed a class action lawsuit against Medical Center seeking declaratory and injunctive relief, and alleging violations of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.) in connection with Medical Center's emergency room billing practices.  Briefly summarized, Naranjo alleged Medical Center's practice of charging him (and other similarly situated patients) an undisclosed "Evaluation and Management Services Fee" (EMS Fee) was an "unfair, deceptive, and unlawful practice."

*Factual Allegations in the First Amended Complaint*

The operative complaint in this matter is Naranjo's first amended complaint (FAC).  We set forth below allegations and contentions contained in the FAC, as well as matters judicially noticed by the trial court——i.e., a "CONSENT FOR TREATMENT AND CONDITIONS OF ADMISSION" (boldface omitted) form (COA) signed by Naranjo when he was seen at Medical Center's emergency department.[1]

"On or about August 15, 2019, [Naranjo] received emergency treatment/services at [Medical Center] …."  He signed a form contract (i.e., the COA) that was presented to him by Medical Center.  However, he was never warned or notified—not in the COA, or in "signage in the emergency room or at the registration … desk," or "verbally at time of registration, … or by any other means" — that Medical Center would charge him an emergency room evaluation and management services fee (EMS Fee) "on top of the individual charges for each item of treatment and services provided."  The COA

---

[1]     Naranjo does not contend on appeal that the trial court erred in taking judicial notice of the COA.  Moreover, in his opening brief on appeal, Naranjo repeatedly references the COA and treats it as authentic.  Accordingly, we do the same.

"contained no agreement for [Naranjo] to pay a separate EMS Fee" and Naranjo did not know Medical Center would add the EMS Fee to his bill.

Naranjo alleged, "[Medical Center's] summary billing statements are not itemized and do not list items separately." As a result, "most emergency room patients never even realize they have been charged a separate EMS Fee, even after their visit." "[E]ven for those patients who do request and receive an itemized billing statement, EMS Fees are listed only as ER ROOM LEVEL [I-V], which does not inform a patient that this is a separate charge simply for receiving treatment in the emergency room."

Medical Center's EMS Fee is "set at one of five levels, determined after discharge, based on an internally developed formula known exclusively to [Medical Center]."[2] The "algorithm used to determine the level of the EMS Fee (1, 2, 3, 4, or 5) is not disclosed to patients, making it virtually impossible for patients to know or seek to control the level or amount of the EMS Fee they will be charged for their emergency room visit."

Medical Center charged Naranjo a total of $12,889.93 before any discounts or adjustments were applied. The gross charge included a "Level 4" EMS Fee in the amount of $8,833.35. After discounts and adjustments were applied, Naranjo's bill was reduced to $6,127.82 which still included a portion of the Level 4 EMS Fee. As of the filing of the FAC, Naranjo had paid Medical Center $900 "a portion of which is for the contested [EMS] Fee." Medical Center "has billed [Naranjo] and continues to seek to collect another $5,227.82 from him … a portion of which is due to the … [EMS] Fee."

Naranjo alleged, on information and belief, his initial billing statement "did not include an itemization of treatment and services received." He subsequently requested and received an itemized billing statement from Medical Center which included the EMS

---

[2]    Naranjo alleges Medical Center's 2020 EMS Fee amounts (which, by their date, may not have been in effect at the time of Naranjo's visit) "are, as follows:  Level 1: $1,287.00; Level 2: $2,789.00; Level 3: $5,927.00; Level 4: $8,305.00; and Level 5: $11,473.00."

Fee. "[T]he EMS Fee was designated as 40100038 ER ROOM LEVEL IV, which hides the fact that the EMS Fee is a separate fee not based on any specific item of treatment or service." Naranjo was "shocked and dismayed" upon learning an EMS Fee in the amount of $8,833.35 had been added to his bill "as a result of merely being seen in [Medical Center's] emergency room, particularly since this surprise charge was basically designed to cover overhead and operational expenses of [Medical Center], such as … general staffing, administrative, equipment, and supply costs incurred in operating an emergency room on a 24-hour, 7 day a week basis."

Naranjo alleged Medical Center's form COA "[does] not describe, mention or inform emergency care patients of [Medical Center's] intention to add" the EMS fee and does not "contain a promise or agreement by a patient to pay" the fee. Such fees are "further concealed by [Medical Center's] failure to mention or disclose this separate charge on its website, or on signage …, or verbally during [Medical Center's] registration process." "Had [Naranjo] been informed about the [EMS] Fee prior to incurring treatment …, [he] would have left and sought less expensive treatment elsewhere."

According to the allegations in the FAC, the EMS Fee is "effectively hidden from patients who might otherwise look for less costly medical treatment and services elsewhere, such as at an urgent care facility or private doctor, or even forego treatment altogether. Knowledge that [Medical Center] charges this separate EMS Fee would be a substantial factor in a prospective emergency care patient's decision to remain at [Medical Center] and proceed with treatment which … is the precise reason why [Medical Center] intentionally conceals such fees."

Naranjo contends Medical Center's "failure to disclose its EMS Fees contributes to a lack of pricing transparency and lack of informed consent by patients who, despite an absolute right to know about this significant charge prior to treatment, are unaware of such EMS Fees or how they are determined." "[E]mergency care patients cannot reasonably be expected to be aware of this EMS Fee" and Medical Center is "well aware

4.

that most emergency room patients are unaware of [its] intention to add an EMS Fee to their bill."

Naranjo acknowledges Medical Center, "like most hospitals, maintains a price list, called a Charge Description Master, or Chargemaster [(hereafter, Chargemaster)], which is a uniform schedule of charges represented by [Medical Center] as its gross billed charge for a given service or item, regardless of payer type," citing Health and Safety Code section 1339.51.  Naranjo contends federal and state law requires Medical Center to publish its Chargemaster "online and/or at the [Medical Center] location."  Naranjo alleges Medical Center "does not make its Chargemaster … reasonably available on its own website or reasonably available to … patients at the time of their emergency room visits."  (Fn. omitted.)  Naranjo alleges the link on Medical Center's Web site to its "Hospital Pricing Information … leads to a .json file which a typical consumer cannot even open on a computer, let alone on a cell phone which would typically be the internet source available to a patient while in the emergency room."  Medical Center's Chargemaster is on file with California's Office of Statewide Health Planning and Development (OSHPD) but it "consists of over 4,000 individual line items of treatment/services and has nothing to do with what items will appear on a patient's billing statement."  "[T]he inclusion of an EMS Fee on a massive price list with over 4000 individual items listed provides no notice to a patient that an EMS Fee will be added to an emergency patient's billed charges."

Naranjo clarifies his claim is "not that [Medical Center] fail[ed] to list an EMS Fee as a line item in the [Medical Center's] published Chargemaster, or that [Medical Center] fail[ed] to list the gross charge of such EMS Fees in [Medical Center's] published Chargemaster, but rather the fact that [Medical Center] gives no notification or warning that it charges a separate surprise EMS fee for an emergency room visit, and there is no agreement to pay for such [EMS] Fee in [the COA] which a patient is asked to sign."

5.

Unlike other fees listed on the Chargemaster, an EMS Fee "is known in advance and automatically applied to the charges for emergency room patients" whereas inclusion of any other Chargemaster fee on an emergency room patient's hospital bill "is solely dependent on which individual items of treatment and services are ordered for the … patient and thus cannot be known by [Medical Center] in advance." As part of the relief sought in the FAC, Naranjo requested "an order requiring [Medical Center] to notify emergency room patients that a substantial, separate EMS Fee is charged for an emergency room visit, since this is knowledge which [Medical Center] exclusively possesses."

The FAC also contains allegations relevant to Naranjo's class action claims and the requirements necessary for class certification. Putative class members are alleged to have experienced the same alleged wrongful conduct that Naranjo experienced. Because class certification is not at issue on appeal, we omit Naranjo's allegations concerning the alleged propriety of class certification.

In his first cause of action for declaratory relief, Naranjo alleged, among other things, an actual controversy exists between him and Medical Center concerning (1) the parties' rights and duties under the COA—specifically whether Naranjo must pay the EMS Fee. Naranjo, on his own behalf and that of the putative class members, seeks a declaration that Medical Center's practice of charging undisclosed EMS Fees is not authorized by Medical Center's COA; and (2) the parties' rights and duties with respect to the disclosure of information concerning EMS Fees—specifically whether Medical Center owes a duty to its emergency room patients to disclose "the existence of and amounts of its EMS Fees … prior to providing [them] treatment triggering such a charge." Naranjo, on his own behalf and that of putative class members, seeks a declaration that Medical Center has a duty to make such disclosures prior to treatment "because of ([a]) the substantial nature of … EMS Fees, ([b]) the relationship between Medical Center and emergency room patients, ([c]) the hidden nature of … EMS Fees,

6.

([d]) the general lack of knowledge of emergency room patients as to such a Fee, ([e]) the lack of reasonable opportunity for an emergency room patient to find out about such a Fee, and ([f]) the fact that knowledge as to such a Fee would be a material factor in a patient's decision to remain at [Medical Center's] emergency room in order to obtain treatment and services."

In his second cause of action for violation of the UCL, Naranjo alleged, among other things, he did not expect to be charged, and relied on not being charged, an undisclosed "substantial and unreasonable separate EMS Fee;" he did not agree to pay the EMS Fee, and would not have accepted treatment from Medical Center had he been informed the EMS Fee would be charged. He alleged Medical Center's policy of charging its emergency room patients an undisclosed and concealed EMS Fee that they have not agreed to pay and which "would be a substantial factor in [their] decision as to whether to" accept treatment is unfair and unlawful. He contended the policy violates the CLRA "such that this [UCL] claim is tethered to a legislatively declared policy"; Medical Center's EMS Fee billing practices "offend established public policies, and are immoral, unethical, oppressive, and unscrupulous"; and said practices are deceptive within the meaning of the UCL.

Finally, in his third cause of action for violation of the CLRA, Naranjo contended, among other things, subdivision (a)(5) and (14) of Civil Code section 1770 "appl[y] in the context of omissions as well as affirmative misrepresentations" and that Medical Center's "acts and practices constitute omissions/concealment that the services and/or supplies in question had characteristics, uses and/or benefits which they did not have" and that Medical Center "omits/conceals that a transaction involves obligations which it does have." Naranjo contended he and putative class members have a right to know about Medical Center's practice of charging EMS Fees and Medical Center has a duty to disclose this practice to them; Medical Center's practice of charging EMS Fees without a corresponding agreement on the part of its emergency room patients to pay the fee, and

7.

its failure to disclose this practice to Naranjo and the putative class members "constitute actionable consumer fraud or deceit because [Medical Center] had exclusive knowledge" of the practice which was "not known or reasonably accessible to [Naranjo] or [putative c]lass members at the time of their emergency room visits"; and "a reasonable consumer, including [Naranjo] would deem the fact he or she would be billed an [EMS] Fee to be an important factor in determining whether" to accept treatment.

Naranjo alleged he has suffered economic injury as a result of Medical Center's EMS Fee billing practices and seeks damages and restitution in addition to declaratory and injunctive relief.

Naranjo proposed Medical Center post a sign in it emergency room to provide patients with sufficient disclosure of Medical Center's EMS Fee billing practice. For example, Naranjo contended appropriate signage could read, as follows:

**"EMANUEL MEDICAL CENTER**

**"NOTICE: EMERGENCY DEPARTMENT VISIT FEES**

**"Our standard Emergency Department Visit Fees are shown below. These fees are in addition to our charges for your actual treatment and services, and are intended to cover the costs of operating and maintaining our 24-hour Emergency Department.**

"Level 1 (CPT code 99281: minor) $ 1,287.00

"Level 2 (CPT code 99282: simple) $2,798.00

"Level 3 (CPT code 99283: moderate) $5,927.00

"Level 4 (CPT code 99284: severe) $8,305.00

"Level 5 (CPT code 99285: complex & life-threatening) $11,473.00

**"Please note: These are our standard gross charges before allowing for any insurance or other discounts that may be applicable. Your out-of-pocket costs may be substantially less than the above amounts.**

8.

**"Additionally, you are entitled to a medical screening examination and stabilizing treatment under State and Federal law regardless of your insurance status or ability to pay."**

Naranjo asserted, "There is nothing in the above signage that would be offensive, or that would violate any existing laws, yet such a sign would greatly enhance the goals of transparency and informed consent."

*Procedural Background*

On March 12, 2021, Naranjo filed his original class action complaint against Medical Center seeking declaratory and injunctive relief, and alleging violations of the UCL and CLRA. On April 27, 2021, Naranjo filed the FAC again seeking the same or similar relief and alleging the same or similar statutory violations as alleged in his original complaint.

On May 28, 2021, Medical Center demurred to each cause of action alleged in the FAC on grounds each failed to state facts sufficient to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)). As part of its filing, Medical Center requested the trial court take judicial notice of the COA signed by Naranjo when he was seen at Medical Center's emergency department, and other decisions.

Naranjo opposed the demurrer and Medical Center's requests for judicial notice. Thereafter, Medical Center filed a reply brief in support of its demurrer and a supplemental request for judicial notice.

On July 7, 2021, the trial court issued its tentative ruling to sustain the demurrer without leave to amend as to each cause of action in the FAC. The ruling indicated the court's decision to grant Medical Center's request to judicially notice the COA. A minute order adopting the tentative ruling issued that same day. A second minute order to the same effect (but which added information concerning the procedural background of the case) issued on August 9, 2021.

On August 11, 2021, judgment was entered against Naranjo and in favor of Medical Center.

9.

Naranjo timely appealed.

## DISCUSSION

On appeal, Naranjo contends he adequately alleged claims for declaratory and injunctive relief, violation of the UCL, and violation of the CLRA. Alternatively, he contends he should have been granted leave to amend to add a claim for breach of contract. Naranjo further contends that he adequately alleged facts to support his claim that Medical Center had a duty to disclose its EMS Fee billing policy and practice; that the trial court's finding that Medical Center had complied with its statutory duty to post its Chargemaster online "cannot be discerned from the pleadings" and "no evidence" of compliance was before the court; that the statutory scheme that requires a hospital to post its Chargemaster online is unrelated to the issue of whether Medical Center improperly failed to disclose its EMS Fee billing practices to patients; and that the court erred in determining compliance with statutory disclosure requirements insulates Medical Center from liability under the UCL.

I.      REQUESTS FOR JUDICIAL NOTICE ON APPEAL

Both parties have requested this court take judicial notice of certain documents. We deferred ruling on these requests pending consideration of the merits of the appeal. We now deny both parties' requests for judicial notice.

   A.  *Medical Center's Request for Judicial Notice Is Denied*

On appeal, Medical Center requests this court judicially notice the opening brief, reply brief, petition for rehearing, petition for review, and request for an order of depublication in *Gray v. Dignity Health* (2021) 70 Cal.App.5th 225 (*Gray*) (collectively, *Gray* documents). Medical Center notes the *Gray* documents were filed by the same attorneys that now represent Naranjo and argues the records are judicially noticeable under Evidence Code sections 452 (records of a state court) and 459 (authority of appellate court to take judicial notice). Medical Center contends "appellate courts have

10.

taken judicial notice of court records in related litigation relevant to the issue before the courts, including briefs filed by the parties."

Medical Center's cited authorities are inapposite. In each of those cited authorities, the records in question were directly related to the case and the parties before the court. (See *Taus v. Loftus* (2007) 40 Cal.4th 683, 725–726 [judicial notice taken of court documents in separate proceeding to determine whether confidential information was taken therefrom]; *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 331, fn. 3 [judicial notice taken of documents filed in appeal in order for court to consider appeal and related writ proceedings together]; *Khodayari v. Mashburn* (2011) 200 Cal.App.4th 1184, 1196 [judicial notice taken of documents related to appellate briefing in criminal case relevant to appeal in related malpractice case]; and *Stein v. Axis Ins. Co.* (2017) 10 Cal.App.5th 673, 685 [judicial notice taken of court documents directly relevant to plaintiffs' claims of whether insurance company violated terms of its policy].)

*Gray* involved an unrelated case and different parties, and there is no suggestion that principles of collateral estoppel apply. Medical Center has failed to show the relevance of the *Gray* documents to the instant matter and we discern none. We decline Medical Center's request to judicial notice the *Gray* documents.

Medical Center also requests we judicially notice its 2019 list of 25 common outpatient procedures filed with OSHPD. We decline to do so except for the limited purpose of acknowledging Medical Center, itself, refers to the EMS Fee as an "Evaluation & Management Services" charge in the attached list.[3] The document attached to Medical Center's request for judicial notice is entitled: "AB 1045 – List of 25 Common Outpatient Procedures *for 2021*" (italics added) and does not appear to be the 2019 list. No effort was made to explain the discrepancy and, aside from a declaration

---

[3] Medical Center argues Naranjo's use of the phrase "Evaluation and Management Services Fee" is, in essence, an acknowledgment the EMS Fee is for "services." It appears, however, Naranjo is using the name Medical Center gave to the fee.

11.

stating that the list is the 2019 list (despite indications to the contrary) no information is provided to demonstrate it is "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (Evid. Code, § 452, subd. (h).) Medical Center has not demonstrated the relevance of the 2021 list.

Finally, Medical Center also requests we judicially notice its 2019 Chargemaster filed with OSHPD. We decline this request as well. Naranjo opposed the request for judicial notice of the Chargemaster noting it is Medical Center's 2021 Chargemaster and not its 2019 Chargemaster. Naranjo supplied this court with Web site links for Medical Center's 2019 Chargemaster and 2021 Chargemaster and we have confirmed the document, by all appearances, is the 2021 Chargemaster. Aside from a declaration averring the document is the 2019 Chargemaster (despite indications to the contrary) no information is provided to demonstrate the document is as averred. Medical Center has not demonstrated the relevance of the 2021 Chargemaster.

### B. Naranjo's Request for Judicial Notice Is Denied

Naranjo requests we take judicial notice of the legislative history of Health and Safety Code section 1339.585 for the sole purpose of "show[ing] that the court in *Gray* … mischaracterized the legislative history of Health & Safety Code section 1339.585 to suggest that it initially applied to emergency patients, but was later amended to exclude emergency patients." According to Naranjo, this is not true. In particular, Naranjo requests we take judicial notice of Assembly Bill No. 1045 (2005-2006 Reg. Sess.) as introduced on February 22, 2005.

*Gray*'s discussion of Health and Safety Code section 1339.585 was relevant to its determination that disclosure of the EMS Fee "is at odds with the spirit, if not the letter, of the hospital's statutory and regulatory obligations with respect to providing emergency medical care." (*Gray*, *supra*, 70 Cal.App.5th at p. 240.) Our disagreement with *Gray* on this issue is discussed below in connection with Naranjo's contention that "the trial court's ruling effectively (and improperly) imposed a safe harbor by implication"

12.

(capitalization and boldface omitted). The text of the original bill (which differed from the text of the statute as enacted) is not relevant to our analysis. Accordingly, we decline to take judicial notice of the document.

## II. STANDARD OF REVIEW

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) "[I]t is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1358.) "And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of [demonstrating] such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan*, *supra,* at p. 318.)

## III. RELEVANT STATE AND FEDERAL STATUTORY LAW CONCERNING HEALTHCARE PRICING DISCLOSURES AND EMERGENCY ROOM CARE

Health and Safety Code section 1317 requires hospitals with emergency departments to provide emergency services and care to a person who "is in danger of loss of life, or serious injury or illness" if "the health facility has appropriate facilities and qualified personnel available to provide the services or care." (*Id.* at subd. (a).) Hospitals are prohibited from basing their decision to provide a patient with such

13.

emergency services and care on the patient's "ability to pay for medical services." (*Id*. at subd. (b).) "Emergency services and care shall be rendered without first questioning the patient or any other person as to his or her ability to pay therefor. However, the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered." (*Id*. at subd. (d).)

Subject to certain exceptions not applicable here, a hospital is required to "file a copy of its [Chargemaster] annually with the [OSHPD]." (Health & Saf. Code, § 1339.55, subd. (a).) The hospital must "make a written or electronic copy of its [Chargemaster] available, either by posting an electronic copy of the [Chargemaster] on the hospital's internet Web site, or by making one written or electronic copy available at the hospital location." (*Id*. at § 1339.51, subd. (a)(1).) In addition, the hospital must "post a clear and conspicuous notice in its emergency department, if any, in its admissions office, and in its billing office that informs patients that the hospital's [Chargemaster] is available in the manner described in subdivision (a)." (*Id.* at subd. (c).)

In addition, a hospital must "compile a list of 25 common outpatient procedures"; "submit annually to the [OSHPD] a list of its average charges for those procedures"; and provide a copy of the list to "any person upon request." (Health & Saf. Code, § 1339.56, subds. (a), (c).)

Similarly, the federal Emergency Medical Treatment and Labor Act (EMTALA) (42 U.S.C. § 1395dd) requires hospitals with emergency departments to provide persons who seek or otherwise present to the hospital for emergency care or service with "an appropriate medical screening examination within the capability of the hospital's emergency department" (*Id.* at subd. (a); 42 C.F.R. § 489.24(a)(1)(i)) and "[i]f an emergency medical condition is determined to exist, provide any necessary stabilizing treatment." (42 C.F.R. § 489.24(a)(1)(ii); 42 U.S.C. § 1395dd, subd. (b)(1)(A).) Federal regulations also require hospitals to "establish, update, and make public a list of all

14.

standard charges for all items and services online" which includes, without limitation, a "[d]escription of each item or service provided by the hospital[]"; the "[g]ross charge that applies to each individual item or service when provided in … the hospital inpatient setting and outpatient department setting[]"; and other pricing related information. (45 C.F.R. § 180.50(a)(1), (b)(1) and (2).)

In promulgating federal regulations concerning hospital price transparency under part 180 of title 45 of the Code of Federal Regulations, the Centers for Medicare & Medicaid Services (CMS), part of the United States Department of Health and Human Services, noted that "[o]ne commenter expressed concern with requiring hospitals to make public standard charges for services of employed emergency room physicians" because it might "undermine the patient protections in place under the [EMTALA]" (84 Fed. Reg. 65524-01, at p. 65536.) "[O]ther commenters stressed how important it is that consumers know the cost of emergency services in non-life threatening circumstances. One commenter explained that he or she might have used price data (if available) to determine which hospital emergency room to go to for treatment of a non-life threatening condition." (*Ibid.*) In response, CMS stated, in part: "To be clear, the price transparency provisions that we are finalizing do not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles. But we do believe the policies we are finalizing, for hospitals to make public standard charges, offer consumers opportunities for informed decision-making by providing them with information about the cost of care which, for example, they might consider prior to visiting a hospital emergency department for treatment of a non-life threatening condition." (*Ibid.*)

IV.    ANALYSIS OF NARANJO'S CLRA CAUSE OF ACTION

    A.  *CLRA*

15.

The CLRA provides a list of proscribed practices. (Civ. Code, § 1770.) Civil Code section 1770 reads, in part: "(a) The unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful …." (*Id.* at subd. (a).) It goes on to list more than two dozen practices prohibited under the statute. (*Ibid.*)

Naranjo alleges Medical Center's EMS Fee billing practice violates paragraphs (5) and (14) of subdivision (a) of the CLRA. Those provisions (and one other) of the CLRA proscribe the following conduct:

> "(4) Using deceptive representations … in connection with goods or services.

> "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. [¶] … [¶]

> "(14) Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." (Civ. Code, § 1770, subd. (a)(4), (5), and (14).)

*B. Relevant Case Law*

In *Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234 (*Gutierrez*), this court concluded that a failure to disclose material facts can form the basis for liability under the CLRA. (*Id.* at p. 1258.) "[A]n omission is actionable under the CLRA if the omitted fact is (1) 'contrary to a [material] representation actually made by the defendant' or (2) is 'a fact the defendant was obliged to disclose.' " (*Ibid.*) Here, Naranjo contends Medical Center owed Naranjo a duty to disclose to emergency room patients the existence of, amount of, and its policy of charging such patients, EMS Fees.

There are at least "four situations in which a failure to disclose a fact constitutes a deceptive practice actionable under the CLRA. [Citation.] Those situations arise when

16.

the defendant is the plaintiff's fiduciary, when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff, and when the defendant actively conceals a material fact. In addition, the duty to disclose exists 'when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.'[4] [Citation.] In the context of the CLRA, a fact is 'material' if a reasonable consumer would deem it important in determining how to act in the transaction at issue." (*Gutierrez*, *supra*, 19 Cal.App.5th at p. 1258.)

Naranjo alleged Medical Center had a duty to disclose its EMS Fee billing practice "because of (1) the substantial nature of [Medical Center's] EMS Fees, (2) the relationship between [Medical Center] and emergency room patients, (3) the hidden nature of [Medical Center's] EMS Fees, (4) the general lack of knowledge of emergency room patients as to such a Fee, (5) the lack of reasonable opportunity for an emergency room patient to find out about such a Fee, and (6) the fact that knowledge as to such a Fee would be a material factor in a patient's decision to remain at [Medical Center's] emergency room in order to obtain treatment and services." Naranjo alleged he and other similarly situated persons "have been impacted financially by [Medical Center's] excessive, undisclosed EMS Fees." He alleged Medical Center's practice of charging emergency room patients undisclosed EMS Fees "offend established public policies, and are immoral, unethical, oppressive, and unscrupulous."

In response to Naranjo's "duty to disclose" argument, Medical Center relies on three published decisions it claims soundly rejected the theory on similar facts: *Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401 (*Nolte*); *Gray*, *supra*, 70

---

**4** Naranjo does not appear to allege (or otherwise contend) that Medical Center omitted a fact that was contrary to a material representation made by Medical Center.

17.

Cal.App.5th 225; and *Saini v. Sutter Health* (2022) 80 Cal.App.5th 1054 (*Saini*). We examine each of those cases further below.

### *Nolte*

In *Nolte*, the plaintiff received non-emergency treatment from a physician whose office was located in a medical building owned by Cedars-Sinai Medical Center (Cedars). (*Nolte*, *supra*, 236 Cal.App.4th at p. 1404.) The physician contracted with Cedars to have Cedars "maintain computerized records" for his patients. After the plaintiff was treated, he received a bill from Cedars in the amount of $167.01 which, after discounting, was reduced to $78.49. (*Id.* at pp. 1404–1405.) The plaintiff had signed a " 'Conditions of Admission' " form which provided, in part, "in consideration of the services to be rendered to the Patient, [the plaintiff] individually obligates himself … to pay the account of [Cedars] in accordance with the regular rates and terms of [Cedars]." (*Id.* at p. 1405.) Similar to the case before us, the *Nolte* plaintiff sued Cedars under the UCL and CLRA contending, among other things, the fee was undisclosed, he did not know he would be charged the fee, and he did not consent to the fee. (*Nolte, supra,* at p. 1405.)

The *Nolte* court concluded no claim was stated under the UCL because (1) "hospitals are required by law to make available a schedule of charges online [i.e., a Chargemaster] or at the hospital, and to provide notice to … patients[] that they have done so … and there [was] no allegation that Cedars did not do so" (*Nolte, supra,* 236 Cal.App.4th at p. 1408); (2) the conditions of admission form signed by the plaintiff obligated him to pay Cedars the fee and noted he would be "billed separately by his physician and by Cedars" (*ibid.*); and (3) the conditions of admission form did not provide that the plaintiff's informed consent was necessary to incur liability for the fee— that is, only "services … under doctors' instructions" required informed consent under the terms of the conditions of admission form (*id.* at p. 1409).

The *Nolte* court rejected the plaintiff's claim that the fee was fraudulent because it was allegedly concealed from him. (*Nolte*, *supra*, 236 Cal.App.4th at p. 1409.) Noting

the test for fraud under the UCL is " ' " 'whether the public is likely to be deceived,' " ' " the court stated, "[T]he complaint does not allege (and the law does not provide)" the plaintiff with the right to advance disclosure of the fee. (*Nolte, supra,* at p. 1409.) The court held Cedars only related disclosure obligations were those set forth in Health and Safety Code section 1339.51 (e.g., posting its Chargemaster online and posting a notice that the Chargemaster is available at the hospital). (*Nolte, supra,* at p. 1409.) *Nolte* did not address the plaintiff's CLRA claim other than to conclude the claim was forfeited. (*Nolte, supra,* at pp. 1409–1410.)

### *Gray*

*Gray* bears greater similarity to the case before us than *Nolte*. In *Gray*, the plaintiff received emergency medical care from the defendant hospital and received a bill with an undisclosed " ' "ER LEVEL 2 W/PROCEDU" ' " charge (ER charge)—similar to the EMS Fee at issue here. (*Gray, supra*, 70 Cal.App.5th at pp. 228–229.) The plaintiff alleged claims under the UCL and CLRA and sought declaratory and injunctive relief to require the hospital to provide advance notice to emergency room patients that such a fee would be charged. (*Gray, supra,* at p. 229.) As here, the plaintiff did not contend the hospital had violated the requirements of Health and Safety Code section 1339.51. (*Gray, supra,* at p. 229.)

The *Gray* court concluded the case before it was analogous to *Nolte* and found *Nolte*'s reasoning persuasive. (*Gray, supra*, 70 Cal.App.5th at p. 238.) *Gray* determined the facts of the case before it were more compelling than those in *Nolte* because, not only did the hospital comply with Health and Safety Code section 1339.51, disclosure of the ER Charge "prior to providing any emergency medical services, is at odds with the spirit, if not the letter, of the hospital's statutory and regulatory obligations with respect to providing emergency medical care." (*Id.* at p. 240.) *Gray* described those statutory and regulatory obligations as follows: (1) hospitals must "provide emergency treatment to *any* person presenting at an emergency department who needs emergency care. ([Health

& Saf. Code,] § 1317, subd. (a); 42 U.S.C. § 1395dd(a).); (2) "Care required to stabilize a patient must be provided *prior* to discussing the patient's ability to pay with the patient or anyone else. ([Health & Saf. Code,] § 1317, subd. (d); 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(d)(4)(ii) (2021).)"; and (3) "And after emergency medical care is provided, hospitals must, in their billing, notify patients of the availability of financial assistance. ([Health & Saf. Code,] § 127405, subd. (a)(1)(A).) Together, this multi-faceted statutory and regulatory scheme reflects a strong legislative policy to ensure that emergency medical care is *provided immediately* to those who need it, and that billing disclosure requirements are not to stand in the way of this paramount objective." (*Gray*, *supra*, 70 Cal.App.5th at pp. 240–241.)[5]

*Gray* also noted CMS adopted new regulations effective January 2, 2021, which require Medicare participating hospitals to post additional information concerning hospital charges including " ' "a consumer-friendly" list of charges for three hundred "shoppable" services, defined as services that can be scheduled in advance.' " (*Gray*, *supra*, 70 Cal.App.5th at 232.) *Gray* commented on the fact CMS had indicated, in response to the concerns of a commenter, that its new rules " 'do not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles.' " (*Id.* at p. 241, citing 84 Fed. Reg. 65536, italics omitted.) Based on this statement, *Gray* concluded the plaintiff "is claiming [the hospital] owes the very pre-treatment disclosure obligation—by signage and direct verbal communication—the [CMS] has reassured hospitals does not exist." (*Ibid*.) The *Gray* court determined that requiring advance notice of the EMS Fee charge would "disregard[]

---

[5]     *Gray* also notes that Health and Safety Code section 1339.585 contains a disclosure requirement but that it does not apply to " 'emergency services provided to a person pursuant to [Health and Safety Code, s]ection 1317.' " (*Gray*, *supra*, 70 Cal.App.5th at p. 231, quoting Health & Saf. Code, § 1339.585.)

the long standing regulatory environment within which emergency departments operate, which emphasizes that no one in need of emergency care should be deterred from receiving it because of its cost." (*Id*. at p. 242.) As a result, the court held the failure to disclose EMS Fees was not an actionable "unfair" practice under the UCL. (*Gray, supra,* at p. 242.)

Based on the above, *Gray* concluded that the plaintiff had made all disclosures required by law and that no CLRA claim was stated under subdivision (a)(5) of Civil Code section 1770 based on a duty to disclose. (*Gray*, *supra*, 70 Cal.App.5th at pp. 244–245.) *Gray* also concluded that, because plaintiff alleged no collateral oral misrepresentations, no cause of action would lie under subdivision (a)(14) of Civil Code section 1770. (*Gray, supra,* at p. 245.)

*Saini*

In *Saini*, *supra*, 80 Cal.App.5th 1054, the plaintiff alleged claims similar to those made in the case before us and in *Gray*—i.e., that a hospital's failure to provide emergency room patients with advanced notice it would charge an EMS Fee violated the CLRA. (*Saini, supra,* at p. 1056.) The *Saini* court adopted the reasoning of *Gray* and *Nolte* in affirming the trial court's order sustaining a demurrer without leave to amend.

*Saini* rejected the argument that *Gray* was wrongly decided because it "fail[ed] to distinguish between discouraging treatment by questioning patients as to their 'ability to pay' for the treatment and merely providing information about the cost of treatment so that the patient can make an informed decision" and that neither federal or state law require a hospital to withhold pricing information or its intent to charge an EMS Fee. (*Saini*, *supra*, 80 Cal.App.5th at p. 1062.) The *Saini* court concluded "there is no withholding of information that is provided on the hospital's [C]hargemaster." (*Ibid*.)

The *Saini* court was also presented with an additional issue (also presented here) that *Gray* recognized an implied "safe harbor" that compliance with the statutory and regulatory disclosure requirements precludes liability for nondisclosure under the CLRA

21.

and that implied "safe harbors" are not recognized under the holding of *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 (*Cel-Tech*). (*Saini*, *supra*, 80 Cal.App.5th at pp. 1064–1065.) Without any substantive analysis, the *Saini* court concluded *Gray* "does not imply a 'safe harbor' for the alleged omission." (*Saini, supra,* at p. 1065.)

### Torres v. Adventist Health System/West

Medical Center acknowledges this court's decision in *Torres v. Adventist Health System/West* (2022) 77 Cal.App.5th 500 (*Torres*) and characterizes it as "diametrically opposed" to *Gray* and *Saini* in determining "the viability of a CLRA claim over alleged nondisclosure of an [EMS Fee]." Medical Center contends *Torres* was "incorrectly decided and should be disregarded" (boldface omitted).

In *Torres*, this court considered a plaintiff's claim that the defendant hospital "engaged in a deceptive practice [under the CLRA] when it did not disclose its intent to charge her a substantial … EMS Fee." (*Torres*, *supra*, 77 Cal.App.5th at p. 503.) The plaintiff argued the defendant hospital had a duty to disclose this information and its failure to do so violated paragraph (5) and (14) of subdivision (a) of Civil Code section 1770. (*Torres, supra,* at p. 507.) The defendant argued, "the Legislature has regulated hospital pricing disclosures and policies, … [the hospital] has complied with those enactments, and … the CLRA does not require it to make the more extensive disclosures sought by [the plaintiff]." (*Id.* at p. 508.)

In *Torres*, we applied the test set forth in *Gutierrez* and concluded the plaintiff adequately alleged that the hospital had exclusive knowledge of material facts concerning its intent to charge the plaintiff an EMS Fee. (*Torres*, *supra*, 77 Cal.App.5th at pp. 509–513.) We likewise acknowledged the *Gray* and *Nolte* decisions but noted "neither of those decisions addressed whether the hospital had a duty to disclose based on its exclusive knowledge of material facts." (*Torres, supra,* at p. 513.) We further noted that

neither case "establish[ed] that a disclosure of the price charged for a service also discloses the circumstances in which the charge is imposed." (*Ibid.*)

However, in *Torres*, we affirmed the trial court's order granting the defendant's motion for judgment on the pleadings on grounds the plaintiff failed to "plead the element of reliance with sufficient particularity." (*Torres*, *supra*, 77 Cal.App.5th at p. 504.) Noting that a party must "prove reliance on an omission by proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.' " (*Id.* at p. 514, citing *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1093.) The *Torres* plaintiff failed to plead she would have behaved differently had she known of the hospital's intent to charge her the EMS Fee and the allegations of the complaint together did not lead to a reasonable inference she would have behaved differently. (*Torres*, *supra,* at p. 514.)

Medical Center contends, contrary to *Torres*' statement that *Gray* did not "address[] whether the hospital had a duty to disclose based on its exclusive knowledge of material facts" (*Torres*, *supra*, 77 Cal.App.5th at p. 513), *Gray* did in fact address the issue and found no duty to disclose the hospital's EMS Fee billing practice, citing *Gray*, *supra*, 70 Cal.App.5th at page 244. Medical Center acknowledges, however, that "the *Gray* opinion did not specifically reference the terms 'exclusive knowledge,' [but that] it is clear … the [*Gray*] court rejected it as a back-door method to imposing a disclosure obligation inconsistent with the determination that the hospital was not obligated to disclose the fee beyond the requirement of state and federal law." With regard to this latter contention, we believe our characterization of *Gray* was correct. However, we do not quibble with Medical Center's characterization of *Gray* as having rejected the plaintiff's "duty of disclosure" claim based on its conclusion that disclosures required under other statutory and regulatory law obviated the need for additional disclosures.

Medical Center also contends this court's conclusion in *Torres* that the plaintiff had sufficiently alleged the hospital's exclusive knowledge of, and the plaintiff's lack of

reasonable access to information concerning, the hospital's EMS Fee billing practice was dicta and that we relied on a portion of the opinion in *Gutierrez* (i.e., that a claim under Civ. Code, § 1770 subd. (a)(5) may be stated absent *any* affirmative representation), which was itself dicta. Two points are worth a response.

First, that a claim under the CLRA may be stated absent an affirmative representation has been determined in case law other than *Gutierrez*. (E.g., *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 256 ["In the CLRA context, a fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a 'reasonable [consumer]' would deem it important in determining how to act in the transaction at issue."]; *MacDonald v. Ford Motor Company* (2014) 37 F.Supp.3d 1087, 1092 [The CLRA "bars omission of any material fact relating to … goods. [Citation.] A manufacturer has a duty to disclose a defect when it has exclusive knowledge of material facts not known to the plaintiff."].)[6] Notably, the same principle of law was recognized in *Gray* which Medical Center relies upon. (*Gray*, *supra*, 70 Cal.App.5th at pp. 243–244.)

Second, "[a]lthough [dicta is] not binding, we may nevertheless consider the reasoning of those decisions to determine whether they have any persuasive effect under the facts presented here. (*In re Marriage of Dunmore* (1996) 45 Cal.App.4th 1372, 1381, … ['Dicta may have persuasive effect in a subsequent decision, but it is not precedent']); (*Masry v. Masry* (2008) 166 Cal.App.4th 738, 741 … ['Dicta may not decide a case but can be persuasive and influence later cases'].)" (*People v. Valencia* (2011) 201 Cal.App.4th 922, 929.) We conclude, consistent with *Gutierrez*, *Collins* and *Torres*, that

---

**6** Failure to disclose material facts within the exclusive knowledge of a seller has also been recognized as supporting causes of action for fraud and deceit in the context of claims not based on the CLRA, and under the UCL. (E.g., *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 [fraud & deceit]; *People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 325 [UCL].)

a cause of action may be stated under the CLRA for failure to disclose a material fact where " 'the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff' " or where " 'the defendant actively conceals a material fact.' "[7]  (*Torres*, *supra*, 77 Cal.App.5th at p. 509.)

Medical Center contends "*Torres* … sets up a completely unworkable disclosure standard based on a *post-hoc* assertion by a plaintiff that 'had I known … I would have gone elsewhere.' "  Medical Center argues the amount of the EMS Fee "cannot be determined until the patient is treated."  Although the level of the EMS Fee to be charged may not be able to be determined until after the patient is treated, there is no suggestion that Medical Center is unable to provide material information concerning *potential* costs of treatment (including the EMS Fee), a description of factors upon which such costs are based, and the potential for discounts.  We disagree that a disclosure requirement is unworkable.

Medical Center further argues some patients may refuse or delay treatment if they knew the potential cost of treatment which "are outcomes the Legislature and the federal government specifically sought to avoid."  We acknowledge these are potential outcomes of requiring disclosure of a hospital's EMS Fee billing practice.  However, such outcomes are also possible under the federal and state rules concerning the publication of a hospital's Chargemaster and the requirement that hospitals provide means for a patient to review the Chargemaster.  (See Health & Saf. Code, § 1339.51, subd. (a)(1) [Chargemaster must be available online or available in a written or electronic form at the hospital]; *id.* at subd (c) [hospital is required to post signs regarding the availability of the Chargemaster].)  A patient who actually reviews the Chargemaster might inquire as to the "Evaluation and Management Services Fee"—i.e., the EMS Fee.  Medical Center cannot

---

[7]      In so concluding, we acknowledge other elements are necessary to state a cause of action under the CLRA, including reliance and causation of damages.  (*Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1386–1387.)

reasonably contend it would be prohibited under the law from disclosing information concerning the EMS Fee upon such an inquiry.

Medical Center argues that "even if omission of a material fact based on 'exclusive knowledge' is a viable claim under the CLRA, allowing juries to decide on a case-by-case basis whether hospitals that comply with state and federal pricing disclosure obligations are liable for misrepresentation would be an inappropriate common-law expansion of the CLRA to impose liability where the Legislature and federal government have carefully spelled out hospital obligations." This argument implicates Naranjo's contention that the trial court's ruling (and case law on which it relied) improperly established an implied safe harbor from liability for a hospital so long as it has complied with the federal and state disclosure statutes concerning publication of the Chargemaster and other pricing information. We consider that argument next.

C. *The Trial Court's Ruling Improperly Created a Safe-Harbor By Implication*

In *Cel-Tech*, *supra*, 20 Cal.4th 163, our state Supreme Court, in considering the broad (but not unlimited) scope of the UCL, noted, "[s]pecific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general [UCL] to assault that harbor." (*Id.* at p. 182.) "The rule does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. (*Id.* at pp. 182-183.) "To forestall an action under the [UCL], another provision must actually 'bar' the action or clearly permit the conduct." (*Id.* at p. 183.) The *Cel-Tech* court concluded, "a plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other provision must actually bar it, however, and not merely fail to allow it. In other words, courts may not use the unfair competition law to condemn actions the Legislature permits. Conversely, the

26.

Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair. Plaintiffs may not 'plead around' a 'safe harbor,' but the safety must be more than the absence of danger." (*Id.* at p. 184; accord, *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 940, fn. 5 [the "argument that [a defendant] should be protected by an implied safe harbor is contrary to the approach adopted" in *Cel-Tech*]; *Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 804 ["Courts … may not create 'implied safe harbors.' "])

Naranjo contends that the trial court impliedly created a "safe harbor" in violation of *Cel-Tech*'s pronouncements when it determined no action would lie for claims alleging a breach of the duty to disclose material facts because federal and state law have other specific disclosure requirements. We agree.

Medical Center responds by noting the trial court's ruling was consistent with the holdings in *Gray* and *Nolte*. Medical Center notes that emergency care may not be denied to a patient in need and that stabilizing care must be provided prior to any discussion concerning a patient's ability to pay. Medical Center quotes *Gray* in noting the "statutory and regulatory scheme reflects a strong legislative policy to ensure that emergency medical care is provided immediately to those who need it, and that billing disclosure requirements are not to stand in the way of this paramount objective." (*Gray*, *supra*, 70 Cal.App.5th at p. 241.) Medical Center notes that *Cel-Tech* required UCL claims to be tethered " 'to some legislatively declared policy or proof of some actual or threatened impact on competition,' in order 'to guide courts and the business community adequately and to promote consumer protection[,]' " quoting *Cel-Tech*, *supra*, 20 Cal.4th at pages 186–187. It argues "that is all that the trial court did here (as well as the First District in *Gray*, *supra*). It concluded that the Payer's Bill of Rights [i.e., Health and Safety Code sections 1339.50–1339.59] specified [Medical Center's] disclosure obligations, and that there was no basis for imposing liability for unfair business practices

27.

under the UCL for failure to do more to disclose the fee before treating an emergency room patient if a hospital complied with the statutory scheme."

Medical Center's attempt to distinguish *Gray*'s holding and the trial court's ruling from *Cel-Tech*'s prohibition against implied safe harbors is not persuasive. The federal and state laws and regulations at issue merely require that hospitals provide emergency room treatment to a patient in need regardless of their ability to pay, that emergency service and stabilizing care be rendered before discussing a patient's ability to pay, and that certain pricing disclosures in certain situations are mandated by law. They do not provide an express safe harbor against CLRA and UCL claims so long as the hospital has complied with mandated disclosures. Moreover, those statutes and regulations do not prohibit Medical Center from providing additional disclosures regarding its EMS Fee billing practice. Such disclosures do not equate to questioning a patient concerning his ability to pay for services nor do they constitute a refusal to provide the patient with an appropriate medical examination and stabilizing care. We conclude the trial court's ruling creates an implied safe harbor in contravention of the holding in *Cel-Tech*.

D. *Naranjo's FAC Alleged Sufficient Facts to State a Claim Under the CLRA*

Naranjo has adequately alleged a claim under the CLRA. Naranjo has alleged Medical Center's EMS Fee billing practices were known exclusively to Medical Center and that information in that regard was not reasonably accessible to Naranjo. (See FAC at ¶ 10 [EMS Fee "is set at one of five levels, determined after discharge, based on an internally developed formula known exclusively to [Medical Center]"; ¶ 17 [Medical Center "knows (and exclusively so) that it will charge each and every patient who receives [emergency room treatment] a separate EMS Fee"]; ¶ 51 [Medical Center "had exclusive knowledge that it would be billing [Naranjo] … such an [EMS] Fee, and this fact was not known or reasonably accessible to [Naranjo]"].

Naranjo further alleged Medical Center's posting of its Chargemaster "gives no notification or warning that it charges a separate 'surprise' EMS Fee for an emergency

28.

room visit" (FAC at ¶ 1); that, in any event, the Chargemaster is not reasonably available to emergency room patients due to the format used in posting it online (FAC at ¶ 16); that the EMS Fee "is not mentioned or disclosed in [the COA]" (FAC at ¶¶ 1, 8, 9, 14 ); and that Medical Center does not otherwise disclose its EMS Fee billing practices "in any emergency room signage, on its website, during the patient registration process, or by any means reasonably designed to apprise prospective patients of such EMS Fees." (FAC at ¶¶ 1, 9, 12.)

Naranjo sufficiently alleged the materiality of the nondisclosure, as follows: "Knowledge that [Medical Center] charges this separate EMS Fee would be a substantial factor in a prospective emergency care patient's decision to remain at [Medical Center] and proceed with treatment." (FAC at ¶¶ 3, 12.)

Naranjo also sufficiently alleged reliance, causation and damages. A party may "prove reliance on an omission by proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.' " (*Torres*, *supra*, 77 Cal.App.5th at p. 514.) Here, the FAC expressly alleged "[h]ad [Naranjo] been informed about the [EMS] Fee prior to incurring treatment that would result in such a Fee, [Naranjo] would have left and sought less expensive treatment elsewhere." (FAC at ¶ 22.) As a result of Medical Center's undisclosed EMS Fee billing practice, Naranjo alleged he has paid portions of the EMS Fee and has been damaged as a result. (FAC at ¶ 23.)

We conclude Naranjo has sufficiently alleged a claim against Medical Center under the CLRA.

V.    ANALYSIS OF NARANJO'S UCL AND DECLARATORY/INJUNCTIVE
      RELIEF CAUSES OF ACTION

*A. Naranjo's FAC Alleged Sufficient Facts to State a Claim Under the UCL*

"[T]he unfair competition law's scope is broad…. [I]t does not proscribe specific practices. Rather, … , it defines 'unfair competition' to include 'any unlawful, unfair or

fraudulent business act or practice.' ([Bus. & Prof. Code,] § 17200.) Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citations.] It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, '[Business and Professions Code] section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180, fn. omitted.) "[A] practice may be deemed unfair even if not specifically proscribed by some other law. 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Ibid.*)

Our state high court has issued the following guidance in determining whether a practice that is not "unlawful" is nonetheless "unfair" and violative of Business and Professions Code section 17200: "[T]o guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under [Business and Professions Code] section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition. We thus adopt the following test: When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes [Business and Professions Code] section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech*, *supra*, 20 Cal.4th at pp. 186–187.)

"By proscribing 'any unlawful' business practice, [Business and Professions Code] 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech, supra,* 20 Cal.4th at p. 180.)

Because we have concluded that Naranjo has stated a valid claim under the CLRA, we likewise conclude his CLRA claim is independently actionable under the UCL and is tethered to the legislative policies underlying the CLRA.

### B. Naranjo's FAC Alleges Sufficient Facts to State a Claim for Declaratory and Injunctive Relief

Code of Civil Procedure section 1060 provides:

> "Any person….who desires a declaration of his or her rights or duties with respect to another….may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties….He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time. The declaration may be either affirmative or negative in form and effect, and the declaration shall have the force of a final judgment. The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought."

Here, Naranjo seeks a declaration of the parties' rights and duties under the COA and their legal rights in connection with EMS Fee disclosures. An actual controversy is alleged and appears to exist. Naranjo is entitled to seek declaratory relief in regard to each controversy stated. We conclude he has adequately stated a cause of action for declaratory relief.

### VI. NARANJO'S CONTRACT-BASED THEORIES

Having determined Naranjo has stated valid causes of action under the CLRA, UCL and declaratory relief statute, we need not consider whether the trial court abused its discretion in denying Naranjo leave to amend. (See *Unruh-Haxton v. Regents of*

31.

*University of California* (2008) 162 Cal.App.4th 343, 371 [where appellate court determines demurrer was incorrectly sustained, "[w]hether the pleadings can or should be amended is for the trial court to decide on remand[]"].)  The trial court is to consider anew any future motion to amend should Naranjo file such a motion.

## DISPOSITION

The judgment of dismissal is reversed.  On remand, the trial court will have discretion to consider a motion by Naranjo to amend the FAC to state a cause of action for breach of contract should Naranjo choose to file one.

Costs on appeal are awarded to appellant Naranjo.


FRANSON, J.


**WE CONCUR:**


HILL, P. J.


SMITH, J.

32.